116 P.3d 1046 (2005)
TAHOMA AUDUBON SOCIETY, Respondent,
v.
PARK JUNCTION PARTNERS, Appellants,
Pierce County, Defendant.
No. 30574-7-II.
Court of Appeals of Washington, Division Two.
August 3, 2005.
*1047 Dianne Kathleen Conway, Margaret Yvonne Archer, William Theodore Lynn, Attorneys at Law, Tacoma, WA, for Appellants.
Robert Eugene Mack, Barbara Anne Henderson, Smith, Alling, Lane, Tacoma, WA, for Respondent.
Jill Guernsey, Pierce County Prosecutors Office, Tacoma WA, for Defendant.
HOUGHTON, J.
¶ 1 As part of a master planned resort near Mt. Rainier, the Park Junction Partners (PJP) proposed to build a lodge with an adjoining conference center. Under the Pierce County Code (PCC), the hearing examiner determined that the conference center was not a "[c]overed structure[] whose primary occupancy is public assembly, with a capacity of greater than 300 persons" and thus was permitted under former PCC 21.14.060(C)(2)(a)(3) (1996).
¶ 2 The Tahoma Audubon Society (Audubon Society) challenged this finding in superior court under the Land Use Petition Act (LUPA). The superior court reversed and PJP appeals.
¶ 3 We affirm in part, reverse in part, and reinstate the hearing examiner's decision.

*1048 FACTS
¶ 4 PJP owns a 440-acre site, located 11 miles from the entrance to Mt. Rainier National Park. The site lies in a volcanic hazard critical area at the base of Mt. Rainier.[1]
¶ 5 On the site, PJP proposed to construct the Park Junction Resort, a large destination resort. The Park Junction Resort will include a 270-room lodge, an 18-hole championship golf course, 300 units of vacation home and condominium sites, 120 units of employee housing, several restaurants, 50 cabins, 50,000 square feet of retail space, a train station, and an interpretative center. Offering various amenities, the lodge will also include restaurants, swimming pools, indoor and outdoor tennis courts, a fitness center, a spa, and a conference center.
¶ 6 This appeal focuses on the conference center. At approximately 18,000 square feet, it can hold 500 people. Rather than a separate structure, the conference center is an adjoining wing of the lodge. It can accommodate a single, large meeting or be divided into several smaller meeting rooms.
¶ 7 PJP anticipates 200 conferences per year in its facility. It estimates that 30 percent of the total business of the lodge will come from conferences, including revenues generated from hotel rooms.
¶ 8 In 1994, PJP began the administrative review process under the State Environmental Policy Act (SEPA). Its application vested in February 1996.
¶ 9 The Pierce County Planning and Land Services Department (PALS) issued the Draft Environmental Impact Statement (DEIS) in January 1997. In the DEIS, PALS concluded that the conference center qualified as a "critical facility" under the PCC:
PCPALS [Pierce County Planning and Land Services] has determined that the conference center qualifies as a critical facility because it meets the definition of "covered structures whose primary occupancy is public assembly, with a capacity of greater that [sic] 300 persons (PCC 21.14.060.C.2)." The project proponent may seek a clarification or a variance from the 300 person limitation on such structures.
Administrative Record (AR) at 4585.
¶ 10 PALS issued the Final Environmental Impact Statement (FEIS) on September 16, 1999. There, it changed its assessment of the conference center, determining that it "[did] not qualify as a critical facility because it [did] not meet the definition" under former PCC 21.14.060. AR at 1287. In a response to comments raised by the Audubon Society, PALS explained its logic:
The county has determined that the facility does not qualify as a critical facility and therefore does not require a variance. The primary use of the Lodge is a private hotel with the number of rooms proposed at 270. The Conference Center is a secondary use to the Lodge.
AR at 3131.
¶ 11 On September 30, 1999, the Audubon Society appealed the FEIS, claiming that it did not adequately address all environmental impacts and alternatives. It did not specifically challenge the conference center issue, but rather made broad assertions: "(3)(d) The proposal is inconsistent with other provisions of the Growth Management Act, Pierce County-wide planning policies, and the Pierce *1049 County comprehensive plan and development regulations." AR at 1198.
¶ 12 The hearing examiner heard the appeal on May 31, 2000.[2] At the hearing, the Audubon Society raised the conference center issue. PJP objected, claiming that any argument was untimely because the Audubon Society did not assert the issue in its written appeal.
¶ 13 In its ruling, the hearing examiner agreed with PALS' assessment of the conference center:
Pierce County Planning and Land Services (PALS) administratively interpreted subsection (C)(2) and determined that the lodge, retail buildings, and interpretive center do not meet the definition of "critical facilities", and therefore could be located within a volcanic hazard area. As stated by the Washington Court of Appeals in Friends of the Law v. King County, 63 Wash.App. 650, 821 P.2d 539 (1991):
It is axiomatic that the courts given [sic] considerable deference to the construction of ordinances by those officials charged with their enforcement. 63 Wash.App. 650 at 654, 821 P.2d 539[.]
The PCC prohibits the location of covered public assembly structures of a size to accommodate 300 persons within a volcanic hazard area. The MPR [Master Planned Resort] lodge, conference room, and other facilities will be privately owned facilities and not public assembly structures. Subsection (C)(2)(8) prohibits "all structures" which can legally accommodate 5,000 people, and no structure, including the lodge, will have a maximum capacity close to said number. Thus, neither the comprehensive plan nor the PCC prohibit construction of the entire project within a volcanic hazard area.
AR at 314-15.
¶ 14 The Audubon Society moved for reconsideration on November 1, 2000. With respect to the conference center, the hearing examiner denied the motion:
The appellants assert that the Examiner erred in finding that since the facilities "will be privately owned", they cannot be considered structures in which "public assembly" will take place. The appellants assert that public assembly structures are not limited to structures owned by public entities. Section 21.14.060(C)(2) PCC prohibits "covered structures whose primary occupancy is public assembly, with a capacity of greater than 300 persons" within a volcanic hazard area. The lodge and other facilities will be marketed to private corporations, businesses, and individuals and will not be structures "whose primary occupancy is public assembly". While an occasional public assembly may take place at the lodge, such will not be its "primary occupancy".
AR at 5. The hearing examiner approved a conditional use permit for the Park Junction Resort on January 12, 2001, subject to 106 conditions.
¶ 15 On February 2, 2001, the Audubon Society filed a petition in superior court under LUPA, chapter 36.70C RCW, challenging the hearing examiner's decision. It asserted several errors but, as noted, only the conference center is before us on appeal.
¶ 16 On June 6, 2003, the superior court granted the LUPA petition on the conference center claim:
3. The Hearing Examiner was incorrect in concluding that, because the facilities in this project would be privately owned, they would not be subject to the provisions of the Pierce County Code regarding critical facilities (Finding[s] 24 and 28), and was also incorrect in concluding that, because the facilities would be marketed to private corporations, businesses, and individuals, they would not be subject to this provision (Finding 6R on Reconsideration).
4. As a matter of law, the Hearing Examiner was incorrect in his analysis of the phrase "public assembly". A covered structure for public assembly of greater than 300 persons is a structure where over *1050 300 people gather in one place for lawful purposes. . . .
. . . .
6. Based on . . . evidence in the record, it would be possible to conclude that the primary use of the entire facility is for a conference center.
7. The hotel and the conference center facilities are each distinct occupancies. The conference facility is not accessory to the use of the hotel. The 500-person conference center has a primary occupancy for public assembly.
8. Although the conference center is attached to the hotel and is part of a complex that includes the hotel, it must be considered independently of the hotel for purposes of a critical facilities analysis. Because the conference center's primary purpose is for public assembly of over 300 people, it is in violation of the Pierce County Code provisions governing volcanic hazard areas. . . .
Clerk's Papers (CP) at 510-12.
¶ 17 Further, the superior court determined that the Audubon Society preserved the issue for review: "Petitioner Tahoma Audubon Society's challenge to the interpretation and application of the County's critical area ordinance was properly made and raised both before the Hearing Examiner and this Court." CP at 512.
¶ 18 PJP appeals.

ANALYSIS

STATUTORY OVERVIEW
¶ 19 Under the Growth Management Act (GMA), each county and city must designate critical areas.[3] RCW 36.70A.170(1)(d).
¶ 20 Acting on this mandate, Pierce County identified "Critical Areas and Natural Resource Lands," codified at former title 21 PCC (1996).[4] Former chapter 21.14 PCC addresses geologically hazardous areas, including volcanic hazard areas.[5] In its statement of purpose, Pierce County explained its intentions:
The intent behind the classification and designation of geologically hazardous areas is to classify and designate areas on which development should be prohibited, restricted, or otherwise controlled because of danger from geological hazards. For purposes of this Title, geologically hazardous areas include the following: . . . volcanic hazard areas.
Former PCC 21.14.010 (emphasis added).
¶ 21 Former PCC 21.14.060(C)(2) limits the construction of "critical facilities" in volcanic hazard areas:
a. No critical facilities shall be constructed or located in volcanic hazard areas identified as having a high or moderate risk of mudflow. . . . Critical facilities are those facilities listed below, as selected from the Uniform Building Code, 1988 Edition, Table No. 23-K.
(1) Hospitals and other medical facilities having surgery and emergency treatment areas;
(2) Structures housing, supporting or containing sufficient quantities of toxic or explosive substances to be dangerous to the safety of the general public if released;
(3) Covered structures whose primary occupancy is public assembly, with a capacity of greater than 300 persons;

*1051 (4) Buildings for schools through secondary or day-care centers, with a capacity of greater than 250 students;
(5) Buildings for colleges or adult education schools, with a capacity of greater than 500 students;
(6) Medical facilities with 50 or more resident incapacitated patients;
(7) Jails and detention facilities; and
(8) All structures with occupancy of greater than 5,000 people.
(emphasis added).
¶ 22 Given this statutory background, we next proceed to the merits.

STANDARD OF REVIEW
¶ 23 LUPA governs judicial review of land use decisions. J.L. Storedahl & Sons, Inc. v. Cowlitz County, 125 Wash.App. 1, 6, 103 P.3d 802 (2004). When reviewing an administrative decision, we stand in the shoes of the superior court. Wenatchee Sportsmen Ass'n v. Chelan County, 141 Wash.2d 169, 176, 4 P.3d 123 (2000). Thus, we limit our review to the record before the administrative tribunal. HJS Dev., Inc. v. Pierce County, 148 Wash.2d 451, 483-84, 61 P.3d 1141 (2003).
¶ 24 The party seeking relief from a land use decision must establish one of the errors set forth in RCW 36.70C.130(1):
(a) The body or officer that made the land use decision engaged in unlawful procedure or failed to follow a prescribed process, unless the error was harmless;
(b) The land use decision is an erroneous interpretation of the law, after allowing for such deference as is due the construction of a law by a local jurisdiction with expertise;
(c) The land use decision is not supported by evidence that is substantial when viewed in light of the whole record before the court;
(d) The land use decision is a clearly erroneous application of the law to the facts;
(e) The land use decision is outside the authority or jurisdiction of the body or officer making the decision; or
(f) The land use decision violates the constitutional rights of the party seeking relief.
This burden remains with the petitioning party on appeal, even if that party prevailed on its LUPA claim. See Pinecrest Homeowners Ass'n v. Glen A. Cloninger & Assoc., 151 Wash.2d 279, 288, 87 P.3d 1176 (2004). Thus, the Audubon Society bears the burden on appeal.

FORMER PCC 21.14.060
¶ 25 The parties dispute the meaning of the phrases "primary occupancy" and "public assembly" under former PCC 21.14.060.[6]
¶ 26 We interpret ordinances using statutory construction principles. City of Spokane v. Douglass, 115 Wash.2d 171, 177, 795 P.2d 693 (1990). As a question of law, we interpret statutes de novo. Waste Mgmt. of Seattle, Inc. v. Util. & Transp. Comm'n, 123 Wash.2d 621, 627, 869 P.2d 1034 (1994). The courts have ultimate authority to determine a statute's meaning and purpose. Postema v. Pollution Control Hearings Bd., 142 Wash.2d 68, 77, 11 P.3d 726 (2000).
*1052 ¶ 27 When interpreting a statute, we must discern and implement the legislature's intent. State v. J.P., 149 Wash.2d 444, 450, 69 P.3d 318 (2003). We give effect to a statute's plain meaning. McGinnis v. State, 152 Wash.2d 639, 645, 99 P.3d 1240 (2004). We derive plain meaning not only from the statute at hand, but also from related statutes disclosing legislative intent about the provision in question. Dep't of Ecology v. Campbell & Gwinn, L.L.C., 146 Wash.2d 1, 11, 43 P.3d 4 (2002). We construe statutes to avoid strained or absurd results. Strain v. W. Travel, Inc., 117 Wash.App. 251, 254, 70 P.3d 158 (2003), review denied, 150 Wash.2d 1029, 82 P.3d 243 (2004).
¶ 28 A term is ambiguous if it is amenable to different, reasonable interpretations. McGinnis, 152 Wash.2d at 645, 99 P.3d 1240. But a statute is not ambiguous simply because different interpretations are conceivable. Fraternal Order of Eagles, Tenino Aerie No. 564 v. Grand Aerie of Fraternal Order of Eagles, 148 Wash.2d 224, 239-40, 59 P.3d 655 (2002), cert. denied, 538 U.S. 1057, 123 S.Ct. 2221, 155 L.Ed.2d 1107 (2003).
¶ 29 When an agency is charged with the administration and interpretation of a statute, its interpretation of an ambiguous statute is accorded great weight in determining legislative intent. Cowiche Canyon Conservancy v. Bosley, 118 Wash.2d 801, 813-14, 828 P.2d 549 (1992). Absent ambiguity, however, we need not defer to the agency's expertise.[7]City of Pasco v. Pub. Empl. Relations Comm'n, 119 Wash.2d 504, 507, 833 P.2d 381 (1992).

A. Primary Occupancy
¶ 30 The parties dispute the meaning of the phrase "primary occupancy." Former title 21 PCC does not define "primary" or "occupancy." But it incorporates the 1988 Uniform Building Code (U.B.C.) by reference. See former PCC 21.14.060.
¶ 31 The former U.B.C. defines "occupancy" as "the purpose for which a building, or part thereof, is used or intended to be used." Former U.B.C. § 416. Every building must be classified according to its occupancy. Former U.B.C. § 501. This classification determines the building's permissible height, construction, and area. See former U.B.C. § 602.
¶ 32 A building may have several different occupancies.[8] Former U.B.C. § 503(a). In the case of mixed occupancy, "each portion of the building shall conform to the requirements for the occupancy housed therein." Former U.B.C. § 503(a). As the Handbook to the U.B.C. explains, this mixed occupancy is common:
It is more common than not for a building to contain more than one occupancy. Even the dwellings in which most of us live usually consist of the dwelling and an attached private garage. In the parlance of the U.B.C., these are two distinct and separate "occupancies." Office buildings of any size not only house the offices but may contain parking garages and, in many cases, cafeterias and other assembly areas. Each of these uses constitutes a distinct and separate occupancy as far as the U.B.C. is concerned.
VINCENT R. BUSH, HANDBOOK TO THE UNIFORM BUILDING CODE: AN ILLUSTRATIVE COMMENTARY, at 21-22 (1988).
¶ 33 Here, the hearing examiner did not expressly rule on this issue. But we may affirm on any proper ground, even one not considered below. Nast v. Michels, 107 Wash.2d 300, 308, 730 P.2d 54 (1986).
*1053 ¶ 34 As the relevant "covered structure," the lodge includes several occupancies. Under former section 1201, the hotel qualifies as a Group R occupancy. Former U.B.C. § 1201 (defining Group R, Division 1 occupancies as "[h]otels and apartment houses"). The restaurants are classified as Group B occupancies. Former U.B.C. § 701 (defining Group B, Division 2 occupancies as "[d]rinking and dining establishments having an occupant load of less than 50").[9] Finally, as a "portion of a building having an assembly room with an occupancy load of 300 or more without a legitimate stage," the conference center qualifies as a Group A occupancy. Former U.B.C. § 601 (Division 2.1). The lodge, then, has several distinct and separate occupancies within the building. Thus, we must identify the primary lodge occupancy.
¶ 35 Neither the PCC nor the U.B.C. define the term "primary." But the U.B.C. expressly states that "[w]here terms are not defined, they shall have their ordinary accepted meanings" as found in "Webster's Third New International Dictionary of the English Language, Unabridged, copyright (1981)." Former U.B.C. § 401. Webster's Dictionary states that "primary" means "first in rank or importance: CHIEF, PRINCIPAL."[10] WEBSTER'S THIRD NEW INT'L DICTIONARY 1800(2 a) (1988).
¶ 36 Here, the "primary occupancy" of the structure is the hotel. Overnight guest accommodation is the principal function of the structure. The lodge contains amenities, including the restaurants, conference center, spa, fitness center, tennis courts, and swimming pools. These services complement and add value to the chief purpose of the structure, the hotel.
¶ 37 The conference center is an important, but secondary, occupancy of the lodge. It will be one of many draws to the resort. As PJP explains, the conference center "is a marketable amenity that will allow the [PJP] to maximize use of the primary occupancy  guest accommodation." Appellant's Reply Brief at 10. Given the remote location, it is unlikely that the resort could even support a conference center without hotel rooms. Because guest accommodation is the principal function of the lodge, the hotel serves as the primary occupancy.

B. Public Assembly
¶ 38 Next, we examine whether the principal function of the structure  the hotel  is used for "public assembly."[11] The former U.B.C. does not directly define "assembly," but it states that an "assembly building" is "a building or portion of a building used for the gathering together of 50 or more persons for such purposes as deliberation, education, instruction, worship, entertainment, amusement, drinking or dining or awaiting transportation." Former U.B.C. § 402. And Webster's Dictionary provides that "assembly" means "a company of persons collected together in one place [usually] for some common purpose (as deliberation and legislation, worship, or entertainment)." WEBSTER'S, at 131 (1988).
¶ 39 Neither the PCC nor the former U.B.C. define "public." Under former U.B.C. § 401, then, we turn to the definition found in Webster's Dictionary. There, it provides that "public" means "accessible to or shared by all members of the community." WEBSTER'S, at 1836(4 a) (1988).
¶ 40 Here, the "primary occupancy" of the lodge is the hotel. Even if open to the *1054 public, the hotel will not be used for assembly. As noted by the Audubon Society, hotels are generally places of public accommodation. But "public accommodation" is not synonymous with "public assembly." Although the hotel has a total capacity of more than 300 persons, hotel guests are not "assembled" within the meaning of the ordinance when housed in separate rooms. As the guest rooms cannot accommodate large gatherings of persons for deliberation, entertainment, or other purposes, the primary occupancy of the covered structure is not public assembly.[12]
¶ 41 Because (1) the primary occupancy of the lodge is the hotel and (2) the hotel is not used for public assembly, we hold that the conference center does not meet the definition of a "critical facility."

C. Policy Concerns
¶ 42 The crux of the Audubon Society's argument is that placement of a master planned resort at the base of Mt. Rainier is inconsistent with public health, safety, and welfare. Admittedly, it seems unwise to build hotels and conference centers in a location threatened with mudslides, debris avalanches, lava flow, and flooding. We do not decide this case based on public policy. Rather, in this appeal, the only issue is whether the conference center meets the definition of a critical facility. It does not. Thus, PJP prevails.
¶ 43 Accordingly, we affirm in part, reverse in part, and reinstate the hearing examiner's decision.
We concur: MORGAN, J., and QUINN-BRINTNALL, C.J.
NOTES
[1] The Final Environmental Impact Statement (FEIS) described "volcanic hazard critical areas":

The [PCC] defines volcanic hazard critical areas as those areas subject to pyroclastic flows, lava flows, and inundation by debris flows, mudflows, or related flooding resulting from geologic and volcanic events on Mt. Rainier (PCC 21.14.020 A). . . .
The [U.S. Geological Survey] report identifies three planning cases for volcanic hazards associated with Mt. Rainier. Case I debris flows are the largest event but least frequent. They are cohesive debris flows that originated as avalanches of weak, chemically altered rock from the volcano. They can occur with or without eruptive activity and the average time interval between Case I flows occurring somewhere on Mt. Rainier is 500-1000 years. . . . A Case II debris flow is a relatively large, non-cohesive mudflow most commonly caused by the melting of snow and glacier ice by hot rock fragment during an eruption. The average time interval between Case II debris flows occurring somewhere on Mt. Rainier is near the lower end of the 100-500 year range.
Administrative Record at 1281.
[2] At the same hearing, the examiner heard PJP's conditional use permit application for the entire Park Junction Resort.
[3] The GMA defines "critical areas" to include "(a) Wetlands; (b) areas with a critical recharging effect on aquifers used for potable water; (c) fish and wildlife habitat conservation areas; (d) frequently flooded areas; and (e) geologically hazardous areas." RCW 36.70A.030(5). Most pertinent to our analysis, "geologically hazardous areas" are those "areas that because of their susceptibility to erosion, sliding, earthquake, or other geological events, are not suited to the siting of commercial, residential, or industrial development consistent with public health or safety concerns." RCW 36.70A.030(9).
[4] In its brief, the Audubon Society cites the current version of the code. Because PJP's rights vested in 1996, the former version controls. Weyerhaeuser v. Pierce County, 95 Wash.App. 883, 890, 976 P.2d 1279 (1999).
[5] Former PCC 21.14.020(AA) defines "volcanic hazard areas" as "those areas subject to pyroclastic flows, lava flows, and inundation by debris flows, mudflows, or related flooding resulting from geologic or volcanic events on Mount Rainier."
[6] As an initial argument, PJP contends that the hearing examiner lacked jurisdiction because the Audubon Society did not specifically assign error to the conference center issue in its notice of appeal. We disagree.

Both parties quote the current version of the PCC. But this version does not control our analysis. PJP's application vested in February 1996. Under the vested rights doctrine, we analyze the provisions in effect at that time. Weyerhaeuser, 95 Wash.App. at 890, 976 P.2d 1279. Notably, the provisions in effect in February 1996 differ substantially from the current code. The current code provides that any aggrieved party must appeal within 14 days of the date of an administrative official's decision, PCC 1.22.090(B)(1)(a), but the former version had no such requirement.
Further, the current code states that the notice of appeal must contain, at a minimum, "[a] concise statement of the factual and legal basis for the appeal citing specifically the alleged errors in the administrative official's decision; and [t]he specific relief sought." PCC 1.22.090(C)(3) and (4). But the February 1996 version remained silent on the content of notices of appeal.
Because the former code had no relevant timing or content requirements, PJP's jurisdiction argument fails.
[7] The parties dispute the agency to which we defer, if any. Because the terms are not ambiguous, we owe no deference. City of Pasco, 119 Wash.2d at 507, 833 P.2d 381.
[8] The Audubon Society points to former U.B.C. § 503(a), arguing that the lodge and conference center must be independently considered. Former U.B.C. § 503(a) provides: "When a building is used for more than one occupancy purpose, each part of the building comprising a distinct `Occupancy' . . . shall be separated from any other occupancy as specified in Section 503(d)." But this "separation" refers to safety and construction issues, namely, the amount of fire-resistive separations required between the occupancies. Former U.B.C. § 503(d). It does not mean that each occupancy must be considered as an independent structure.
[9] We cannot determine the restaurants' capacities from the record. But the Audubon Society does not dispute this classification.
[10] The Audubon Society cites provisions of the Washington Administrative Code (WAC) to define the phrase "primary function." Respondent's Br. at 37 (citing provisions of the WAC that discuss disabled access to buildings). But the PCC adopts the U.B.C. by reference. And when a term is undefined, the U.B.C. directs persons to Webster's Dictionary for the "ordinary accepted meanings." Former U.B.C. § 401. Thus, the dictionary definition controls. Schrom v. Bd. for Volunteer Fire Fighters, 153 Wash.2d 19, 27, 100 P.3d 814 (2004) (stating that "[d]efinitions provided by the legislature are given controlling effect").
[11] As the parties correctly note, the conference center provides a place of assembly. But this is irrelevant because the primary occupancy of the lodge is the hotel. As such, we analyze whether the hotel is used for public assembly of more than 300 people.
[12] The Audubon Society argues that we must examine state statutes and case law to determine the meaning of "public assembly." But when a term is unambiguous, we do not turn to legislative history, case law, or other principles of statutory construction. State v. Roggenkamp, 153 Wash.2d 614, 621, 106 P.3d 196 (2005).