[No. 34128-0-II.   Division Two.   May 30, 2007.]

QUALITY ROCK PRODUCTS, INC., ET AL., *Respondents*, v.
THURSTON COUNTY ET AL., *Appellants*.

*Elizabeth Petrich*; and *David A. Bricklin* and *Devon N. Shannon* (of *Bricklin Newman Dold, LLP*), for appellants.

*Gregory J. Dennis* (of *The Landerholm Firm*); *David J. Ward* (of *Buchalter Nemer, PCC*); *Dawn F. Reitan* and *Katherine F. Weber* (of *Inslee Best Doezie & Ryder, PS*); and *Michael C. Simon* (of *Landerholm, Memovich, Lansverk & Whitesides, PS*), for respondents.

¶1 ARMSTRONG, J. — A Thurston County hearing examiner granted a special use permit (SUP) to Quality Rock Products, Inc., and Eucon Corporation (collectively Quality Rock) to expand gravel mining operations at their Thurston

County mine. On review, the Board of County Commissioners (Board) remanded the matter to the hearing examiner to determine the proposed use's effect on the Black River. The hearing examiner, after considering a report and testimony from Quality Rock's expert, again conditionally approved the SUP. The Board again reversed the hearing examiner's decision and denied the SUP, ruling that Quality Rock failed to show that the proposed expansion would have no significant adverse impact on the surrounding environment, specifically the Black River. Quality Rock then filed an action under the Land Use Petition Act (LUPA), chapter 36.70C RCW, seeking to reinstate the hearing examiner's decision. Quality Rock also sued for damages and attorney fees and sought a declaratory judgment allowing it to operate an asphalt plant at the mine site. The superior court reversed the Board's ruling and reinstated the hearing examiner's decision.

¶2 Thurston County and the Black Hills Audubon Society now appeal and Quality Rock cross-appeals the superior court's order dismissing its claims for damages and attorney fees and its request for a declaratory judgment. We hold that the Board did not err in finding that Quality Rock failed to show that the proposed use was consistent with Thurston County's comprehensive plan goals and that its proposed use would not significantly impact the Black River. Accordingly, we reverse and reinstate the Board's decision denying the SUP. We affirm the trial court's dismissal of Quality Rock's damage and declaratory relief claims.

## FACTS

¶3 Quality Rock owns a 151-acre site in Thurston County that is adjacent to a national wildlife refuge's designated boundaries and approximately 500 feet east of the Black River. The area's geological conditions cause the groundwater under Quality Rock's site to flow toward and recharge the Black River. Quality Rock currently operates a gravel mine on 26 acres of the 151-acre site under a permit

the county granted to the mine's previous owners. The Department of Natural Resources has designated those 26 acres as a mineral resource land of long term commercial significance. The site's remaining 125 acres do not share that designation.

¶4 The Washington State Department of Ecology (DOE) lists the Black River as "water quality impaired" under section 303(d) of the clean water act. Administrative Record (AR) at 346. Low flows are partially at fault for the Black River's water quality impairment. The Black River is one of the last large, intact riparian systems in the Puget Sound area, and the United States Fish and Wildlife Service is actively acquiring properties along portions of the Black River to preserve the existing wetland system and the habitat for migratory birds and fish and other species. Because of the Black River's low volume in the summer months, DOE closes the river to any additional water takings from July 1 to September 30. WAC 173-522-050.

¶5 Shortly after acquiring the site, Quality Rock applied to the county for a SUP, seeking to expand its mineral extraction operation from the originally permitted 26 acres to 151 acres, replace a concrete batch plant, install a new asphalt plant, and recycle concrete and asphalt. Quality Rock proposed to expand the mine in several phases. In phases one through three, Quality Rock plans to excavate above the groundwater table. Quality Rock then plans to excavate below the groundwater table in phases four through six. Excavation phases four through six would create a 75-acre lake.

¶6 The hearing examiner approved Quality Rock's SUP subject to 25 conditions. Condition "Y" of the hearing examiner's first decision stated, "The last three phases of the operation shall be subject to further review including detailed analysis of the impact of groundwater to the site, the aquifer and the Black River. This information shall be presented at a public hearing at the appropriate time." AR at 362. Black Hills appealed the hearing examiner's deci-

sion to the Board, and Quality Rock appealed certain conditions that the hearing examiner imposed.

¶7 After a closed-record appeal, the Board remanded the matter to the hearing examiner with directions for Quality Rock to perform a "detailed analysis" of the mine expansion's impact to the groundwater, aquifer, and the Black River. AR at 3223-24. The Board stated that several of the hearing examiner's findings, conclusions, and conditions necessitated remand "for the purpose of conducting a detailed analysis of the impact to the groundwater, aquifer and the Black River, called for in condition Y, prior to the issuance of the SUP, because if there are problems that can't be mitigated it may alter the entire approval of the project which should be done up front and not several years down the road." AR at 3224.

¶8 Quality Rock hired Pacific Groundwater Group to perform an additional hydrogeological analysis to address the Board's concerns. As part of Pacific Groundwater Group's analysis, it installed four monitoring wells, excavated three pits to examine the upper 18 feet of geologic materials, measured water levels in wells and surface water bodies, measured stream flows at two locations, conducted an aquifer test, developed a groundwater flow model of part of the Ashley Creek[1] groundwater basin, and "assessed effects of aggregate extraction on groundwater and surface water." AR at 41. Robert Mead, the county's expert hydrogeologist, concluded that the materials Quality Rock submitted, including the Pacific Groundwater Group report, "adequately address the Hearing[ ] Examiner's issues." AR at 2489.

¶9 The hearing examiner's decision on remand incorporated most of the factual findings and all of the conclusions from the first hearing. The hearing examiner entered additional factual findings relating to the Board's concerns and entered conclusions based on those findings. Based on

---

[1] Ashley Creek is a stream that flows through a portion of Quality Rock's property and empties into the Black River.

his findings and conclusions, the hearing examiner again approved the SUP, subject to conditions. Black Hills appealed the decision to the Board. Quality Rock did not cross-appeal the conditions the hearing examiner imposed in approving its SUP on remand.

¶10 The Board again denied Quality Rock's SUP, determining that (1) "the proposed location for the gravel mine is not appropriate due to the gravel mining operations' significant adverse impacts on the surrounding sensitive environment[ and (2)] the proposed gravel mine is not consistent with the comprehensive plan policies on the natural environment." AR at 3229. The Board stated that based on the hearing examiner's findings and the lack of findings regarding impacts to the Black River, the examiner's ultimate conclusion that the project's proposed location was appropriate was not supported by substantial evidence.

¶11 Quality Rock filed a LUPA petition seeking review of the Board's decision and filed a complaint for money damages and declaratory relief. The trial court reversed the Board and reinstated the hearing examiner's decision. It also denied Quality Rock's damages and attorney fee claims, finding that the Board did not arbitrarily, capriciously, or unlawfully reverse the hearing examiner's decisions.

¶12 The trial court stated that the hearing examiner was the highest fact finder entitled to deference and that the court "reviews the record to determine if the determination made by the trier is supported by substantial evidence when viewing the record as a whole." Report of Proceedings (RP) at 119. It ruled that "[t]he [B]oard, by failing to take issue with the [hearing examiner's] findings of fact, accept[s] those facts as verities." RP at 118. It then determined that, viewing the record as a whole, "the hearing examiner's decision[ ] [is] extensive and . . . supported by . . . substantial evidence." RP at 119. Additionally, the trial court stated that although the hearing examiner mislabeled some findings of fact as conclusions of law, his

conclusions of law were "appropriate applications of the law." RP at 120.

¶13 The county and Black Hills appeal the trial court's decision. Quality Rock cross-appeals the trial court's denial of its damages claims and the court's failure to rule on Quality Rock's motion for declaratory judgment.

¶14 The principal issue on appeal is whether the Board erred in ruling that Quality Rock failed to demonstrate that its proposed use was consistent with the county's comprehensive plan's goals and that its proposed special use would not significantly adversely impact the environment.

## ANALYSIS

### I. Standard of Review

¶15 LUPA governs review of land use decisions. *See Wenatchee Sportsmen Ass'n v. Chelan County*, 141 Wn.2d 169, 175, 4 P.3d 123 (2000). A land use decision is "a final determination by a local jurisdiction's body . . . with the highest level of authority to make the determination, including those with authority to hear appeals, on . . . [a]n application for a project permit." RCW 36.70C.020(1)(a). In this case, the Board, functioning as an appellate body, had the county's highest level of decision making authority. TCC[2] 2.06.070, .080; TCC 20.60.020 (Table 2). Accordingly, we review the Board's decision, not the hearing examiner's.

¶16 We limit our review of the Board's decision to the record before the Board. *HJS Dev., Inc. v. Pierce County*, 148 Wn.2d 451, 483-84, 61 P.3d 1141 (2003) (citing *King County v. Wash. State Boundary Review Bd.*, 122 Wn.2d 648, 672, 860 P.2d 1024 (1993)). We may grant relief to Quality Rock, as the party seeking relief under LUPA, only if Quality Rock establishes one of RCW 36.70C.130(1)'s six standards. Under the facts of this case, Quality Rock must establish that:

---

[2] Thurston County Code.

(b) The land use decision is an erroneous interpretation of the law, after allowing for such deference as is due the construction of a law by a local jurisdiction with expertise;

. . . .

(d) The land use decision is a clearly erroneous application of the law to the facts;

(e) The land use decision is outside the authority or jurisdiction of the body or officer making the decision.

RCW 36.70C.130(1)(b), (d), (e).

██ ¶17 Standards (b) and (e) present questions of law that we review de novo, giving deference to the Board's specialized knowledge and expertise. *Pinecrest Homeowners Ass'n v. Glen A. Cloninger & Assocs.*, 151 Wn.2d 279, 290, 87 P.3d 1176 (2004) (citing *Isle Verde Int'l Holdings v. City of Camus*, 146 Wn.2d 740, 751, 49 P.3d 867 (2002)); *see also Cingular Wireless, LLC v. Thurston County*, 131 Wn. App. 756, 768, 129 P.3d 300 (2006) (citing *HJS Dev., Inc.*, 148 Wn.2d at 468).

██ ¶18 Under standard (d)'s "clearly erroneous application" test, we apply the law to the facts and overturn the land use decision only if we have a "definite and firm conviction" that the decision maker committed a mistake. *Citizens to Pres. Pioneer Park, LLC v. City of Mercer Island*, 106 Wn. App. 461, 473, 24 P.3d 1079 (2001) (citing *Schofield v. Spokane County*, 96 Wn. App. 581, 586, 980 P.2d 277 (1999)).

## II. Burden of Establishing RCW 36.70C.130(1)'s Enumerated Errors

██ ¶19 Black Hills argues that Quality Rock, as the party seeking relief from a land use decision, has the burden of establishing one of RCW 36.70C.130(1)'s enumerated errors on appeal. Quality Rock argues that "[i]t is unclear from the case law" whether the party appealing from the highest fact finding level or the party appealing from an appellate body bears the burden of proof on appeal. Reply Br. of Resp't at 8. Quality Rock maintains that

because the county and Black Hills lost before the hearing examiner, they bear the burden of proof on appeal, regardless of "whether that appeal is to the [Board], [the] Superior Court, or to this Court." Reply Br. of Resp't at 10. Quality Rock is mistaken.

¶20 Quality Rock bases its position on its belief that "[Black Hills] was the party seeking relief from the land use decision." Reply Br. of Resp't at 9. But as we have discussed, the Board, and not the hearing examiner, entered the land use decision in this case. And RCW 36.70C.130(1) provides potential grounds for relief from a *land use decision*. Here, Quality Rock filed a LUPA petition in Mason County Superior Court seeking review of the Board's denial of its SUP.

¶21 On appeal, the party who filed the LUPA petition bears the burden of establishing one of the errors set forth in RCW 36.70C.130(1), even if that party prevailed on its LUPA claim at the superior court. *See Tahoma Audubon Soc'y v. Park Junction Partners*, 128 Wn. App. 671, 681, 116 P.3d 1046 (2005) (citing *Pinecrest*, 151 Wn.2d at 288).[3] Thus, although Quality Rock partially prevailed before the superior court, it still bears the burden of establishing that one of RCW 36.70C.130(1)'s enumerated standards provides relief from the Board's decision.

¶22 In any event, the question of who has the burden of proof is not significant here because we are reviewing a legal decision. To obtain a SUP, Quality Rock had the burden of showing that its proposed use complies with the county's zoning code. TCC 20.54.040. The zoning code requires that the use comply with the comprehensive plan and that it is appropriate in the proposed location. TCC

---

[3] Quality Rock's attempt to distinguish *Tahoma Audubon*, 128 Wn. App. 671, on the ground that no Board reviewed the hearing examiner's decision fails because there the losing party before the hearing examiner filed a LUPA petition in the superior court. *Tahoma Audubon*, 128 Wn. App. at 681. The court stated that the "burden [of establishing one of the errors set forth in RCW 36.70C.130(1)] remains with the petitioning party on appeal, even if that party prevailed on its LUPA claim." *Tahoma Audubon*, 128 Wn. App. at 681 (citing *Pinecrest*, 151 Wn.2d at 288). Quality Rock filed the LUPA petition; it is the petitioning party.

20.54.040(1), (3). And this requires a showing that the proposed use will not result in substantial or undue adverse effects on the natural environment. TCC 20.54.040(3)(a). The hearing examiner found that Quality Rock had carried its burden of proof. The Board accepted the hearing examiner's findings but disagreed with his legal conclusion that Quality Rock's proposal complied with the county's zoning code. The question on appeal is whether the Board erred in ruling that Quality Rock's evidence failed to establish that its proposed use posed no threat of substantially harming the environment.

### III. Thurston County's Code and the Board's Decision

■ ¶23 Under the Thurston County Code, "[e]ach zoning district lists special uses that, because of their special impact or unique characteristics, can have a substantial adverse impact upon or be incompatible with other uses of land." TCC 20.54.010. The code also provides a review process for evaluating a proposed special use's location, scale, compatibility with rural character, and development characteristics, as well as its impact on adjacent properties and the community as a whole. TCC 20.54.010, .040, .060, .070. Because county officials often cannot determine the proposed uses in advance, the county requires compliance with general and specific development standards for these special uses as a prerequisite to permit approval. TCC 20.54.010, .040, .070; *Cingular*, 131 Wn. App. at 775 (" 'In addition to the specific standards set forth hereinafter with regard to particular special uses, all uses authorized as special uses shall meet the following standards.' " (quoting TCC 20.54.040)). Thus, for the Board to approve its SUP, Quality Rock had to meet both the specific standards applicable to mineral extraction and the general standards applicable to all special uses. TCC 20.54.040, .070(21); ch. 17.20 TCC.

¶24 TCC 20.54.040 provides the general standards applicable to Quality Rock's proposed project. TCC 20-.54.040(1) states that all proposed special uses "shall

comply with the Thurston County Comprehensive Plan and all applicable federal, state, regional, and Thurston County laws or plans." And the general standard in TCC 20-.54.040(2) requires "[t]he proposed use [to] comply with the general purposes and intent of the applicable zoning district regulations and subarea plans." Additionally, "[n]o application for a special use shall be approved unless a specific finding is made that the proposed special use is appropriate in the location for which it is proposed." TCC 20.54.040(3). The decision making authority must base that finding, in part, on the following criteria:

> Impact. The proposed use shall not result in substantial or undue adverse effects on adjacent property, neighborhood character, natural environment, traffic conditions, parking, public property or facilities, or other matters affecting the public health, safety and welfare.

TCC 20.54.040(3)(a).

¶25 When the Board remanded this case to the hearing examiner, it asked for a "detailed analysis of the impact to the groundwater, aquifer and the Black River." AR at 3224. Quality Rock produced a hydrogeologic analysis report (report or study) and a supplemental report from Pacific Groundwater Group addressing groundwater issues. Quality Rock argues that the supplemental report shows that the proposed expansion would have very little impact to water quality and quantity.

¶26 Quality Rock points to a portion of the study that says the resulting 75-acre lake would result in an "estimated reduction in groundwater recharge at the pit lake [of] approximately 5 to 9 [percent] of the current groundwater flow beneath the mine[, which is] equivalent to the withdrawal of a few domestic wells."[4] AR at 2507. The

---

[4] The county and Black Hills criticize the analysis because Pacific Groundwater Group compared the new lake evapotranspiration rate with a forested land's evapotranspiration rate. The area is not forested and more water flows through bare land than forested land to an underlying aquifer. Pacific Groundwater Group used the forested land comparison, assuming that the land would be returned to a vegetated state "after mining is completed." AR at 2503. The county and Black

report says that "[i]n comparison to the water budget of the Black River valley, however, the change is extremely small." AR at 2507. Missing from this analysis, however, is any assessment of this withdrawal's effect on the Black River's flow volume, particularly during the peak production, dry summer months.

¶27 Quality Rock admits that it did not conduct site specific analysis from the area downgradient of the mine, but it maintains that it did not need to because (1) TCC 17-.20.200 does not require that data; (2) that data was unnecessary in any event because Pacific Groundwater Group assumed that all water flows through the site into the Black River; and (3) Robert Mead, the county's expert hydrogeologist, never requested any such information and deemed the Pacific Groundwater Group studies appropriate and conclusive on all water issues that the Board remanded. Quality Rock argues that by "assuming that 100 [percent] of the groundwater flowing through the site reaches the Black River, [Pacific Groundwater Group] projected the maximum impact to that system." Br. of Resp't at 25. Thus, Quality Rock argues, "Site specific studies downgradient of the mine were [unnecessary]." Br. of Resp't at 25.

¶28 But none of this directly answers the Board's concern about the specific impact the increased mining would have on the Black River. In addressing the problem of increased water evaporation from the new lake, Pacific Groundwater Group concluded that "[i]n comparison to the water budget of the Black River valley, however, the change [from previous evaporation to new] is extremely small." AR at 2507. The Board was clearly looking for more than this. The hearing examiner's findings document the Black River's fragile condition, particularly during the dry months, which are also the high-volume mining months. So sensitive is the river during these months that the State has

---

Hills point out that Pacific Groundwater Group's estimated loss to the aquifer is low because of this. Moreover, Quality Rock may not be completed with the mining for years.

closed it to further water takings. The Board was properly concerned with knowing the exact impact, as far as science can demonstrate, that the increased mining would have on the river. An "extremely small" conclusion does not meet this concern. Rather, it removes from the Board the ability to decide on its own whether the increased evaporation would significantly impact the river.

¶29 In addition, Pacific Groundwater Group did not investigate Quality Rock's 5,000 gallon-per-day well presently on the property. Quality Rock contends that because the well is legal and it has the right to draw 5,000 gallons per day from it, the county lacks authority to regulate, restrict, or prohibit Quality Rock's use of the well. Quality Rock misses the point. Quality Rock had the burden of showing that its expanded operation would not significantly impact the river. And even if some of its present water use would be protected under an expanded mining operation, the Board was entitled to know the impact on the river of present water use combined with new water use. Again, Quality Rock, through Pacific Groundwater Group's study, did not provide the specific information the Board needed to evaluate the total impact.

¶30 Finally, Quality Rock's failure to present sufficient information on the critical question is reflected in the hearing examiner's findings. The examiner entered findings on the expected effects on neighbors' wells and Ashley Creek, the expected evapotranspiration changes caused by the 75-acre lake, and the general effect to the underlying aquifer. But he made no findings as to the specific effect the project would have on the Black River.

¶31 The Board's decision to deny Quality Rock's SUP is consistent with TCC 20.54.040(3)(a)'s requirement that the county will not grant a SUP without a showing that the proposed special use will not cause substantial adverse impacts to the environment. In ultimately denying Quality Rock's SUP application, the Board stated that several of the hearing examiner's factual findings "clearly establish that there is a hydraulic link between the groundwater on site

and to the water quality impaired Black River[, and that] the proposal [poses] a significant risk to groundwater." AR at 3230-31. The Board also noted that although it had remanded for study of the impacts to the Black River, "the hearing examiner did not make any findings on impacts to the Black River." AR at 3231. Based on the hearing examiner's findings and the lack of findings addressing impacts to the Black River, the Board ruled that the record did not support the conclusion that the proposed project "will not have an adverse impact on the surrounding environment, including the Black River." AR at 3231.

¶32 The Board also explained that the proposed expansion was not consistent with the comprehensive plan's natural environment policies on (1) protecting wildlife habitat for important species and protecting unique and rare habitats; (2) recognizing the hydrologic continuity between ground and surface water; (3) protecting groundwater aquifers, fish and wildlife habitat, and recreational functions of streams; and (4) protecting streams from adverse impacts of activities occurring adjacent to their waters or within their watersheds by avoiding degradation of water quality.

¶33 Quality Rock takes issue with the brevity of the Board's finding with respect to compliance with the comprehensive plan's policies. But the Board's decision lists several of the hearing examiner's factual findings that show inconsistencies between the proposed project and the comprehensive plan's policies on the natural environment. For instance, the Board noted the hearing examiner's findings that (1) the Black River refuge surrounds the subject property; (2) the United States Fish and Wildlife Service is actively acquiring properties along the Black River to preserve the existing wetland system that provides a habitat for migratory birds and fish and other species; (3) groundwater beneath the site flows from east to west, toward the Black River; (4) the Black River is water quality impaired; and (5) the Black River is considered to be one of the last large, intact riparian systems in the Puget Sound area.

## IV. Alleged RCW 36.70C.130 Errors

### 1. Decisions Outside the Board's Authority or Jurisdiction—RCW 36.70C.130(1)(e)

¶34 We may grant Quality Rock relief from the Board's decision if Quality Rock establishes that the decision "is outside the [Board's] authority or jurisdiction." RCW 36.70C.130(1)(e). Quality Rock argues that the Board acted outside of its authority and jurisdiction because the county's mitigated determination of nonsignificance (MDNS) was final and binding, and the Board's decision contradicts the MDNS.

¶35 Quality Rock reasons that because the county's responsible official determined that, as mitigated, the project "does not have a probable significant adverse impact upon the environment," the county is now "bound by its own final determination that the project did not have probable significant adverse environmental impacts." Br. of Resp't at 29. Citing *Lakeside Industries v. Thurston County*, 119 Wn. App. 886, 83 P.3d 433 (2004), and *Wenatchee Sportsmen Ass'n*, 141 Wn.2d 169, Quality Rock contends that the county's and Black Hills's failure to appeal the MDNS bars the Board from determining that the project has a significant adverse impact on the surrounding environment. Thus, Quality Rock argues, the Board acted outside of its authority and jurisdiction when it disregarded the "binding conclusion" and declared that the project would have " 'significant adverse impacts on the surrounding sensitive environment.' " Br. of Resp't at 29 (quoting Clerk's Papers at 475); *see* RCW 36.70C.130(1)(e).

¶36 Neither *Lakeside* nor *Wenatchee Sportsmen Ass'n* stands for the proposition that the failure to appeal an MDNS bars the Board from determining that the project has significant or undue adverse impacts. Quality Rock is correct that a party who wants to appeal a State Environmental Policy Act (SEPA), chapter 43.21C RCW, determination, such as an MDNS, must appeal that decision along

with the underlying government action subject to SEPA. *State ex rel. Friend & Rikalo Contractor v. Grays Harbor County*, 122 Wn.2d 244, 249, 857 P.2d 1039 (1993). But no Washington court has held that a party must appeal a SEPA decision, such as an MDNS, to validate a challenge to the permit itself.

¶37 The MDNS is a "threshold determination." AR at 631. The MDNS expressly notes that "[t]he issuance of this Determination of Nonsignificance does not constitute project approval. The applicant must comply with all applicable requirements of Thurston County Departments and/or the Hearing Examiner prior to receiving permits." AR at 631. Moreover, the MDNS requires Quality Rock to obtain a SUP. And to get the SUP, Quality Rock had to show that its proposed use would not result in substantial or undue adverse affects to the natural environment. TCC 20.54.040(3)(a). The county issued the MDNS without access to most of the information that the hearing examiner and the Board ultimately based their decisions on. For instance, Quality Rock's response to the environmental checklist that it completed to obtain the MDNS did not even identify the Black River as a surface water body in the proposed expansion's vicinity. The MDNS did not bind the Board to a determination that the proposed expansion would not result in significant adverse impacts to the natural environment.

### 2. Clearly Erroneous Application of the Law to the Facts—RCW 36.70C.130(1)(d)

¶38 Under LUPA, we may grant Quality Rock relief from the Board's decision if Quality Rock establishes that the decision "is a clearly erroneous application of the law to the facts." RCW 36.70C.130(1)(d).

¶39 Quality Rock argues that the Board misapplied the law to the facts because the Board applied the wrong criteria in denying Quality Rock's SUP. Specifically, Quality Rock maintains that the Board erroneously applied TCC 20.54.040(3)'s "appropriate location" criteria to the facts

when the Board concluded that the proposed expansion would result in "significant adverse impacts" rather than "substantial or undue adverse effects," per TCC 20-.54.040(3)(a).

¶40 In denying Quality Rock's SUP, the Board stated that "the proposed location for the gravel mine is not appropriate due to the gravel mining operations' significant adverse impacts on the surrounding sensitive environment." AR at 3229. The Board also stated that "the proposed gravel mine is not consistent with the comprehensive plan policies on the natural environment," that "the proposal does pose a significant risk to groundwater," and that "the hearing examiner's ultimate conclusion that the proposed location of the project is appropriate and that the project will not have an adverse impact on the surrounding environment, including the Black River, and community is not supported by the evidence in the record." AR at 3229, 3231.

¶41 The Board's statements adequately convey the Board's basis for denying the SUP. Further, TCC 20-.54.040(3) does not require the Board to use the exact phrase "substantial or undue adverse effects" in explaining its decision. And the Board's language accurately reflects its core decision that Quality Rock failed to show the absence of a substantial adverse or harmful impact to the environment. Quality Rock has not persuaded us that the Board clearly misapplied the law. *Mercer Island*, 106 Wn. App. at 473 (citing *Schofield*, 96 Wn. App. at 586).

### 3. Erroneous Interpretation of the Law—RCW 36.70C.130(1)(b)

¶42 As previously mentioned, we may grant Quality Rock relief from the Board's denial of its SUP if Quality Rock establishes that the Board's decision "is an erroneous interpretation of the law, after allowing for such deference as is due the construction of a law by a local jurisdiction with expertise." RCW 36.70C.130(1)(b).

¶43 Quality Rock contends that the Board erroneously interpreted the law when it concluded that the hearing

examiner's mitigating conditions were inadequate. But the heart of the Board's decision was that Quality Rock failed to show the project's true impact of its proposed SUP on the Black River. And if the Board did not know the full impact, it could not test the adequacy of the hearing examiner's mitigating conditions. Thus, because Quality Rock failed to provide an accurate measure of the risk, the Board did not err in rejecting mitigating factors.

¶44 A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder shall be filed for public record pursuant to RCW 2.06.040, it is so ordered.

HOUGHTON, C.J., and HUNT, J., concur.

Review denied at 163 Wn.2d 1018 (2008).